CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
September 20, 2024
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TED ACORD, as Administrator of the Estate of Michael Acord, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 7:22-cv-00284 |
| v. | ) ) ) | By: Elizabeth K. Dillon |
| CHAD STILLEY, | ) ) | Chief United States District Judge |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

In this civil rights lawsuit, the plaintiff Ted Acord (plaintiff or Acord), is the administrator of the estate of his brother and decedent, Michael Acord (Michael). Acord asserts claims against the sole defendant, Chad Stilley, who at the time of the relevant events was a police officer for the Town of Narrows.

On July 24, 2020, Michael was driving his motorcycle at a high rate of speed and being pursued by a non-defendant police officer. Stilley, who was in his unmarked police vehicle ahead of the chase's path, attempted to stop traffic and ultimately stopped his cruiser in the roadway ahead of the chase. The parties dispute the immediate actions by Michael and by Stilley prior to impact, but Michael crashed into the front of Stilley's cruiser and died as a result of his injuries.

As discussed in more detail below, the court concludes that Stilley is entitled to qualified immunity as to the 42 U.S.C. § 1983 claim asserting a Fourth Amendment violation and also entitled to immunity as to Acord's state-law battery claim. Thus, the court will grant Stilley's

motion for summary judgment and deny all other pending motions as moot.[1]

## I.  BACKGROUND

At about 10 p.m. on July 24, 2020, Michael was driving a motorcycle west on Route 460 near Narrows, Virginia, when he was passed by the eastbound-traveling Officer Vinson of the Pearisburg Police Department.  Vinson's front radar recorded Michael as driving 80 miles per hour in a 65 mile-per-hour zone, and Vinson's back radar recorded him speeding up to 89 miles per hour as he sped away.  Vinson turned around, and, after he got close enough to Michael, he turned on his lights and then his siren.  Michael sped up more; he did not slow down.  During a chase that lasted approximately three minutes, Michael was traveling at very high speeds, even exceeding 100 miles per hour.  As he entered the Town of Narrows, for example, he was traveling at 103 miles per hour in a 40 mile-per-hour zone.  The chase ended with Michael crashing into defendant Stilley's unmarked police cruiser, which had its lights activated and siren on, killing Michael on impact.

Stilley, who was an officer with the Narrows Police Department, heard about the speeding motorcyclist over the radio, was nearby, and offered to help.  He was at a Marathon gas station located at the Northwest corner of the intersection of Route 460 and 3rd Street, and Michael and Vinson were headed in his direction.

The area is depicted in the Google Earth image on the next page.[2]  As shown in that image, at the place where the collision occurred, Route 460 has two lanes headed in each

---

[1]  Both parties have filed motions to exclude experts and testimony in the case (Dkt. Nos. 32, 35, 38, 40, 42, 44), although the responses to those are not yet due.  The parties agree that those motions would be mooted by the grant of summary judgment.  (*See* 2nd Joint Mot. for Ext. ¶  5, Dkt. No. 54 ("Response briefing on the parties' motions to exclude will only be necessary if this case proceeds to trial."); 3rd Joint Mot. for Ext. ¶ 7, Dkt. No. 60 ("[I]t is the Parties' position that response briefing on the motions to exclude will only be necessary if this case proceeds to trial.").)  Thus, the court need not resolve those motions.

[2]  This photo was taken from one of the expert's reports in the case.  (*See* Dkt. No. 50-12, at 5.)

direction, and there is a small, unraised center median between them.  (Just farther west of where

the collision occurred, a raised, concrete center median begins and then turns to grass.)  There

was no turn lane at the location, so traffic could turn from the eastbound lanes onto 3rd Street by

crossing in front of westbound traffic.  The Marathon gas station and convenience store are the

large awning and building, respectively, located at the Northwest corner of the intersection of

Route 460 and 3rd Street.



In response to Stilley's offer to help, Officer Vinson responded, "Ah, I don't know what

you can do, I'm on him pretty good.  He's not really leaving me.  At 100 [miles per hour] right

now." (Vinson Dashcam 10:00:03.[3])  At the time, Stilley was parked on 3rd Street,

perpendicular to Route 460, but just off the roadway.

---

[3]  There are different versions in the record of the dashcam videos from Vinson's and Stilley's vehicles, and the timestamps do not match.  The court cites to a side-by-side view of the two videos in which the timing has been synchronized.  That version also contains a "Time to Impact" timer counting down.  Citations herein utilize the timestamp from Vinson's video when referring to either.

Stilley later asked for a location update and then pulled forward slightly into the right westbound lane and turned his blue lights on, about 38 seconds before the collision.  (*See generally* Stilley Dashcam 10:00:37.40.)  This apparently caused traffic in the right westbound lane to stop, and there were still three, stopped civilian vehicles in the right lane at the time of the collision.  Stilley states that he then noticed a minivan, driven by Paul Pitzer, in the left eastbound lane with its left blinker on, indicating that it intended to cross the westbound lanes of traffic and turn left onto Third Street.  He then moved forward part way into the left westbound lane and activated his strobe and light function and siren to try to get the minivan to stop.  At around the same time, Vinson stated over the radio that the pursuit was entering the 40 mile-per-hour zone—where Town limits began and roughly one half-mile from Stilley—at speeds of 103 miles per hour.  (*See* Vinson Dashcam 10:00:55–58, Stilley Tr. 13, Dkt. No. 36-3.)  In response, Stilley stated, "I'm stopping traffic, see if that'll slow him down some."  (Stilley Dashcam 10:01:00.)  That was approximately fourteen seconds before the collision.

The van eventually stopped.  (*See generally* Stilley Tr. 10–15, 70, 77–78, 81, 85–87 (Stilley recounting the incident and his thinking throughout the various steps).)  Stilley claims that his intent, after the van stopped, was to reverse his vehicle back out of the roadway.  At that point, though, he looked up and saw the motorcycle approaching.  It is undisputed that Stilley accelerated forward shortly before Michael reached his location, and that movement is visible on his dashcam video and accompanied by the sound of a revving engine.  The last movement forward occurred about two seconds before Michael collided with the front driver's side of Stilley's vehicle.  (Stilley Dashcam 10:01:13.)

In his deposition, Stilley testified that he believed the motorcycle was losing control as it headed toward him (based on a wobbly headlight), and he made the split-second decision to

move forward so he would absorb the impact of the crash, rather than have Michael crash into Pitzer's minivan.  (Stilley Tr. 11–14, 77–78, 85–87, 94, 96.)  Also visible on the two dashcam videos are a number of other vehicles traveling in the right eastbound lane, including one that passes in front of Stilley's vehicle less than one second before impact and another two in the seconds following.

Acord insists that Stilley effectively created a roadblock, first by stopping traffic in the right westbound lane, causing traffic (like Pitzer) in the eastbound left lane to stop, placing his car in the left westbound lane, and then in moving forward at the last moment, cutting off Michael's only "means of escape."  (Pl.'s Opp'n to Mot. Summ. J. (hereinafter "Opp'n") 12, Dkt. No. 50.)  Acord also accuses Stilley of having shifting reasons for his last movement forward, and the parties dispute his motives for that last movement.[4]

Given those disputes, the court must construe all facts in a light most favorable to plaintiff.  And a reasonable jury could conclude both that Stilley moved forward solely to stop

---

[4] Plaintiff claims Stilley has given two conflicting versions of the event.  The first, which Stilley made while in the hospital hours after the crash, plaintiff calls the "Initial Statement."  The second, which plaintiff calls the "Litigation Explanation," was given by Stilley both in his deposition and in discovery responses, more than three years after the crash and after having watched the dashcam video multiple times.  (Opp'n 2)  This second version also was "hinted" at during Stilley's criminal trial by his defense attorney, but Stilley did not testify at that trial.  (*Id.* at 5 n.2.)

According to the Initial Statement which the State Trooper interviewing Stilley wrote down, Stilley believed he was going to be hit by Michael, so he turned away and tried to get away from the point of impact.  In doing so, he stated that he may have picked up his foot off of the brake and it may have rolled over the gas pedal briefly.  (Opp'n 2, 5-6; *see also* Statement, Dkt. No. 50-3.)  The Litigation Explanation, by contrast, describes an intentional movement farther out into the lane to protect Pitzer in the minivan.  (Opp'n 2.)  Acord emphasizes that the first statement nowhere referenced or noted a van or any detail concerning the van, but instead suggested that Stilley's vehicle moved forward accidentally.  He contends that there are numerous ways in which the Litigation Explanation "is replete with implausible, inaccurate, and impossible contentions."  (*Id.* at 7.)

Plaintiff's argument ignores at least part of Stilley's statement, which refers to the fact that he had one vehicle in the "eastbound . . . left lane stopped" (Statement 1, Dkt. No. 50-3), which was most likely a reference to the van.  Moreover, the court is not convinced that the two explanations are inconsistent, and Stilley's brief provides an explanation as to why they are not necessarily inconsistent.  (Reply in Supp. of Mot. for Summ. J. 2–5, Dkt. No. 51.)  Additionally, one of Stilley's proffered experts also offers an opinion as to why his initial statement may not have included that information.  Nonetheless, the court may not judge credibility at this stage, and the court finds that a reasonable jury could disbelieve Stilley's so-called "Litigation Explanation" and determine that Stilley was unaware of the minivan or that he moved only to block Michael's path, not because he thought Michael was going to hit the van.

Michael and that he was unaware of the minivan.  *See supra* note 4.  It also could find that, had Stilley not moved forward at the last moment, Michael would not have collided with either Stilley's vehicle or Pitzer's, but he could have gone around Stilley and continued on his way.[5]

To be clear, and despite Acord's focus on Stilley's intent, an officer's underlying intent or motivation is not relevant to the qualified immunity inquiry; what matters are the facts and circumstances known to the officer.  *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015).  But, for the reasons explained above and *supra* at note 4, a jury could determine that Stilley was not aware of the presence of the minivan.

Acord's opposition lists all of the facts he disputes in a pages-long footnote.  (Opp'n n.1 (spanning pp. 2–4).)  The disputes primarily call into question Stilley's motives, whether Stilley acted to protect Pitzer, and the extent of the recklessness of Michael's driving.  Acord also insists repeatedly that Stilley's conduct established a roadblock, despite Stilley's denials in his deposition.  (Opp'n 11–14.)  And he asserts that any "roadblock" violated Narrows Police policy, which allows a roadblock only with the approval of the Chief of Police or his lieutenant and which should only be used "in the case of suspected or fleeing felons whose escape poses a danger to life."  (Opp'n 13 (quoting from Dkt. No. 50-13, at 20).)[6]

In addition to the issue of Stilley's reasons for moving forward, the court finds that the relevant facts include the following (taking the facts in the light most favorable to Acord):

---

[5]  Pitzer testified that he believed Stilley's last-minute "goose" of his vehicle in front of Michael saved Pitzer's life and that Michael was headed toward his vehicle and would have slammed into his minivan had Stilley not moved forward.  (Pitzer Tr. at 16, 18–19, 29–31, Dkt. No. 36-6.)  At the hearing, counsel for both parties spent a lot of time discussing Pitzer and whether his view of events is even relevant.  Because the court treats Stilley as being unaware of Pitzer's presence, the court need not determine the relevance or weight to be accorded Pitzer's testimony.

[6]  As Stilley rightly points out, the violation of a policy does not necessarily constitute a constitutional violation.  *See Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (holding that a prison official's failure to follow internal policies "is not actionable under [section] 1983 unless the alleged breach of policy rises to the level of a constitutional violation").

- Michael was speeding and passing other vehicles, but he was not "weaving" through traffic or driving on the wrong side of the road;

- Michael had committed the misdemeanor crime of reckless driving and misdemeanor eluding, but he was not engaged in felony eluding;

- There were other vehicles at the intersection where Stilley was located, and several vehicles passed by in the right eastbound lane in the seconds preceding and following the impact;

- A half-mile farther west on Route 460, there were lane closures on a turn in the road because of a prior mudslide.  At that point, the two lanes of traffic in each direction were reduced to one lane each way, with westbound traffic re-routed to what would normally be an eastbound lane and the lanes marked by orange traffic cones, (Pitzer Tr. at 22–24, Dkt. No. 36-6), and Stilley knew this fact; and

- In blocking all lanes of escape, Stilley created a de facto roadblock and used deadly force.

With regard to the second bullet point, Acord disputes that Michael's speed was fast enough to constitute reckless driving because his initial speed was 80 miles per hour, neither 20 miles per hour over the posted speed limit nor in excess of 85 miles per hour.  *See* Va. Code Ann. § 46.2-282 (setting forth those two ways to engage in reckless driving).  The undisputed facts establish otherwise, though.  By the time Michael had passed Vinson's cruiser, Vinson's back radar clocked him at 89 miles per hour in a 65 mile-per-hour zone, which qualifies as reckless driving under either of those parameters.  And Stilley was told before he used force that Michael was driving over 100 miles per hour when he entered the town, which had a 40 mile-per-hour speed limit.  Indeed, Vinson testified that Michael's speed was fast enough to warrant a charge of reckless driving.  (Vinson Tr. 10, Dkt. No. 36-1.)

As to eluding, the distinction between misdemeanor eluding and felony eluding is set forth in the statute.  Michael committed a felony if he drove his vehicle "so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person."  Va. Code Ann. § 46.2-817(B).  If he was just attempting to escape or elude without interference or

endangerment, he committed a misdemeanor. *Id.* § 46.2-817(A). The pursuing officer, Vinson, testified that Michael's conduct constituted felony eluding (Vinson Tr. 39, Dkt. No. 36-1), and a jury would certainly be justified in concluding that Michael was committing felony eluding, given that his driving "endanger[ed]" others. But at the very least, he committed misdemeanor eluding.

As to the fifth bullet point, the parties devote a lot of their briefing to arguing over whether this was a "roadblock," which has a specific meaning to law enforcement. In the court's view, this issue bears only on whether there was a seizure. For purposes of the Fourth Amendment analysis, the parties appear to agree to agree to treat Officer Stilley as having purposefully blocked Michael's path, which would make his movement a seizure, regardless of whether it was a true "roadblock" or not. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (explaining that a seizure occurs when an officer intentionally terminates an individual's freedom of movement).

## II. OVERVIEW OF PARTIES' ARGUMENTS

In his motion for summary judgment, Stilley argues that summary judgment should be granted in his favor both because he did not violate Michael's Fourth Amendment rights and because he is entitled to qualified immunity, based on the lack of clearly established law that his conduct would violate Michael's Fourth Amendment rights. Stilley admits that there was a seizure, but he claims that because he used force (even if considered deadly force)[7] to end a high-speed chase that endangered the general public as well as drivers specifically where he was located (and especially Pitzer, the minivan driver), the force he used was objectively reasonable

---

[7] Stilley "does not concede that he used deadly force." (Mem. Supp. Mot. Summ. J. 18 n.13, Dkt. No. 36; *see also id.* at 19 n.14 (citing to authority holding that it is not "deadly force" where the officer does not intend to kill with his actions, even if the actions result in death).) But viewed in Acord's favor, a jury could find that Stilley did so.

and not excessive under the Fourth Amendment.

The complaint also contains a state-law battery claim, and Stilley correctly notes that Acord's battery claim rises and falls with his Fourth Amendment excessive force claim. (Mem. Supp. of Mot. Summ. J. 24–25, Dkt. No. 36.) *See also Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Stilley further contends that he is entitled to "state law good faith immunity" with respect to the state law claim. (*Id.* at 25 (citing *Russell v. Wright*, 916 F. Supp. 2d 629, 644–45 (W.D. Va. 2013)).)

Acord argues that there are disputes of fact as to what Stilley knew at the time and why he blocked or created obstacles in the roadway (or at least three of the four lanes), and he contends that Michael's conduct did not justify the use of deadly force. As to qualified immunity, he maintains that clearly established law prohibited Stilley's actions.

### III. DISCUSSION

**A. General Legal Principles**

**1. Fourth Amendment claims**

A claim "that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007). Applying the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).

The court considers three factors to guide this balancing, including (1) "the severity of the crime at issue," (2) the extent to which "the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (quoting *Smith*, 781 F.3d at 101); *see also Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (explaining that the operative question in determining whether the force utilized was "excessive" is whether a reasonable officer would have determined that the degree of force used was justified by the threat presented under the circumstances). The officer's conduct is not judged with the "20/20 vision of hindsight," because officers are often called on "to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97. Instead, the factors are analyzed using "the information possessed by the officer at the moment that force is employed." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

### 2. Qualified immunity

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden of proof is on the party seeking qualified immunity. *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 219 (4th Cir. 2018).

In determining whether an official is entitled to summary judgment on the basis of qualified immunity, courts engage in a two-pronged inquiry. *Smith*, 781 F.3d at 100. The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* (citing *Saucier v. Katz*, 533 U.S.

194, 201 (2001)).  The second prong asks whether the right was "clearly established" at the time of the defendant's conduct.  *Id.*  If the answer to either prong is "no," the official is entitled to qualified immunity.

In determining whether a right is clearly established, the court looks first to cases of controlling authority—here, the Supreme Court, the Fourth Circuit, and the Supreme Court of Virginia.  *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 538 (4th Cir. 2017) (citations omitted).  "Ordinarily," the court need not look any further, but when "there are no such decisions from courts of controlling authority," the court also may look to "a consensus of cases of persuasive authority from other jurisdictions, if such exists."  *Id.* at 538–39 (citations omitted).

Additionally, it is important to frame the right at the correct level of generality.  To deny qualified immunity, the law must be "clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation he confronted.'"  *Mullenix v. Luna*, 577 U.S. 7, 12–13 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *id.* at 12 (explaining that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition").  While there need not be a case "'directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)).

**B.  Application to Acord's Claims**

Stilley's opening memorandum analyzes the *Graham* factors and posits that his actions, even if viewed as establishing a roadblock or intentionally trying to completely block Michael's path to stop him—and thus using deadly force—were objectively reasonable.  (Mem. Supp. of Mot. Summ. J. 18–19 ("Where the officer has probable cause to believe that the suspect poses a

threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).) Stilley also argues that he is entitled to qualified immunity regardless, because it was not clearly established that his actions would violate Michael's Fourth Amendment rights. The court agrees that the law was not clear on that point and so concludes that Stilley is entitled to qualified immunity. In particular, the court concludes that the law was not clearly established that Stilley's conduct would constitute a violation under *Graham*.

At the hearing, Acord's counsel expressed his reliance on three binding cases to show that the law was clearly established that Stilley's actions violated Michael's rights, as well as two Sixth Circuit cases. (Hr'g Tr. 42–43, Dkt. No. 59.)

The first case on which Acord relies is *Brower*, 489 U.S. 593.[8] *Brower* establishes that Stilley's conduct was a seizure (which Stilley does not dispute), but nothing in *Brower* addresses whether the force used was unreasonable. There, the district court had dismissed a § 1983 complaint, concluding that there was no seizure. The Supreme Court reversed and stated in dicta that the character of the roadblock matters, suggesting that a roadblock could be unreasonable if set up in such manner as to be likely to kill the fleeing person and not give him an opportunity to stop. *Id.* at 599. There, the police set up a roadblock for a person who had stolen a car and then engaged police in a high-speed chase for 20 miles. The roadblock's set-up included: (1) placing an 18-wheeler across the road; (2) setting up the roadblock around a curve, so it would not be

---

[8] In his brief, Acord also cites to *Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) (en banc), in which the court concluded that a deputy was not entitled to summary judgment on either the substantive claim or qualified immunity grounds where he shot a fleeing suspect, believing he was using his taser, but actually used his firearm. (*See* Opp'n 18–19.) *Henry*, however, is not even close to this case factually. And while the court said using deadly force against a "fleeing, nonthreatening misdemeanant [was] unlawful," the misdemeanant (accused of failing to pay child support) was fleeing on foot from his driveway to his home, and there was nothing threatening or dangerous about his conduct. It was a far cry from a motorcycle driver fleeing from police at night, exceeding speeds of 100 miles per hour, and where other motorists are on the road and the roadway ahead has a significant lane closure.

seen until the last moment; and (3) shining headlights toward the driver to blind him.  *Id.* at 594.

Despite the suggestion that the roadblock may have violated the decedent's rights, the only issue

actually decided in that case was whether there was a seizure.  *Id.* at 599–600.  The Court did not

consider whether that seizure was objectively unreasonable but specifically remanded for that

determination.  *Id.*  Then, on remand, the Ninth Circuit held there were factual disputes over

whether the seizure was reasonable, and they could not be resolved on a motion to dismiss.

*Brower v. Cnty. of Inyo*, 884 F.2d 1316 (9th Cir. 1989).  So, *Brower* does not speak to the issue

here, which is whether it was clearly established that Stilley's conduct would violate Michael's

constitutional rights.

The second case on which Acord relies is *Garner*, 471 U.S. 1, which his counsel

described as discussing and providing analysis for a continuum of force.  (Hr'g Tr. 42–43.)  In

setting forth its balancing test in *Graham*, the Fourth Circuit cited to *Garner* for the need to

consider all the relevant circumstances.  But the facts in *Garner* do not resemble the facts here.

There, an officer pursued on foot a young man who had just left an apparent burglary of a

dwelling.  471 U.S. at 4.  The man fled on foot and stopped when he encountered a fence at the

edge of the yard.  The officer was able to see the suspect's face and hands and was "reasonably

sure" that he was unarmed.  *Id.*  The officer called out, "police, halt" and took a few steps toward

him, and the suspect started to climb over the fence.  *Id.*  As he climbed, the officer shot and

killed him.  *Id.*  Clearly, and unlike Michael in this case, that suspect posed no threat to anyone at

the time deadly force was used.

The third case on which Acord relies to show a clearly established right is *Williams v.*

*Strickland*, 917 F.3d 763 (4th Cir. 2019).  Specifically, Acord relies on a quotation from that case

that states, "An officer may reasonably apply deadly force to a fleeing suspect—even someone

suspected of committing a serious felony—only if the officer has 'probable cause to believe that the suspect poses a significant threat of death or serious injury to the officer or others.'"  917 F.3d at 769 (quoting *Garner*, 471 U.S. at 3).  "And even a 'significant threat of death or serious physical injury' to an officer does not justify the use of deadly force unless the threat is 'immediate.'"  *Id.* (quoting *Garner*, 471 U.S. at 3).  The facts of *Williams*, however, are strikingly different than the facts here.  There, as construed in the plaintiff's favor, two officers repeatedly fired their weapons into the plaintiff's car *after* he had passed them and while he was attempting to drive away, causing significant injuries.  *Id.* at 766.  Because they were "no longer in the car's trajectory" and thus not in immediate danger at the time they employed deadly force, the officers violated the Fourth Amendment.  *Id.* at 769.

*Williams* does not clearly establish that Stilley's actions were unconstitutional, either.  First of all, the *Williams* Court expressly recognized that under certain conditions, officers could use deadly force against the driver of a car, such as when they are in the car's trajectory.  *Id.*  Furthermore—and importantly—*Williams* did not involve a high-speed chase on roadways in which innocent bystanders were at risk; the entirety of the incident took place in an apartment complex parking lot.  *See id.* at 766 (describing facts).

In addition to the fact that none of those three cases—*Brower*, *Garner*, or *Williams*— clearly provides notice that using deadly force to stop a high-speed chase on roads with other traffic present would violate the Fourth Amendment, there are several cases that suggest the use of such force in the situation that Stilley confronted was constitutional.

First, the Supreme Court in *Mullenix*, 577 U.S. 7, which was decided after both *Brower* and *Garner*, stated that it has "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying

14

qualified immunity." 577 U.S. at 15. *Mullenix* involved a motorist who was fleeing from arrest and engaged in a lengthy (almost 18-minute) high-speed pursuit. The motorist had conveyed to dispatch during the chase that he had a gun and would shoot at police officers if they did not abandon their pursuit. *Id.* at 8. At one location where spike strips had been laid, but before the vehicle reached the strips, the defendant officer got out of his car and shot at the vehicle six times. *Id.* at 9. The car then hit the spike strip, hit the median, and rolled. The driver was killed by the shots, four of which struck his upper body. *Id.* at 9–10. The court considered existing authority, including *Garner*, *Scott*, and *Plumhoff v. Rickard*, 572 U.S. 765 (2014), discussed below, and concluded that none of those precedents "squarely govern[ed]" the facts here. *Id.* at 15. Thus, the officer was entitled to qualified immunity. *Id.*

In *Scott*, an officer rammed his bumper to the rear of the fleeing motorist's car, causing the vehicle to topple down an embankment, flip, and crash, resulting in serious injuries. The Court held that utilizing that pitting maneuver to end a high-speed chase did not offend the Fourth Amendment. *See Scott*, 550 U.S. at 386 ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.").

In other cases, too, courts have held that an officer's use of deadly force to stop a fleeing motorist did not violate the Fourth Amendment. *Plumhoff v. Richard*, 572 U.S. 765, 776–77 (2014) (concluding that police acted reasonably in firing 15 shots into a vehicle that had been stopped after a high-speed chase, where the driver appeared intent on resuming his flight); *see also Dalton v. Liles*, No. 5:19-cv-00083, 2021 WL 3493150, at *6 (W.D.N.C. Aug. 9, 2021) (holding that it was objectively reasonable for officers to conclude that a high-speed chase

"posed a substantial and immediate risk of serious physical injury to others, and to attempt to terminate the chase by employing the PIT maneuver").

*Abney v. Coe*, 493 F.3d 412 (4th Cir. 2007), is a case with similar, but not identical facts. There, the Fourth Circuit held that a deputy's conduct in ramming his car into the back of a motorcycle whose driver was fleeing from police was reasonable under the Fourth Amendment. While being pursued, the motorcyclist had crossed double yellow lines trying to pass other vehicles on at least five occasions, and, in one instance, he ran another vehicle off the road. *Id.* at 414, 416–17.  He also had failed to stop at any point, despite being pursued by one deputy using lights and sirens, having a minor collision with that deputy's vehicle at one point, and having to drive around a different police vehicle parked directly in his path. *Id.*  In holding that his conduct "was a danger for the life of others" and that it was thus "eminently reasonable" to use the force the deputy did, the Fourth Circuit relied in part on *Scott*. *Id.* at 417.  To be sure, Michael's conduct was not as dangerous as the motorcyclist's in *Abney*, but he posed a danger to persons nonetheless.[9]

Turning to out-of-circuit authority, the court looks first to the two Sixth Circuit cases on which Acord relies, both of which are factually similar.  The first is *Buckner v. Kilgore*, 36 F.3d 536 (6th Cir. 1994).  In *Buckner*, two apparently intoxicated juveniles, not wearing helmets, were reportedly seen on a motorcycle. *Id.* at 538.  One officer attempted to pull them over by activating his cruiser's lights. *Id.*  The motorcycle failed to stop, and a chase ensued, reaching

---

[9] In this respect, this case is unlike others where courts have found constitutional violations and the behavior by the fleeing suspect was far less dangerous than Michael's.  *See, e.g.*, *Moody v. Ferguson*, 732 F. Supp. 627 (D.S.C. 1989) (holding that shooting into a fleeing suspect's car violated the Fourth Amendment where the suspect drove quickly in reverse away from the officer (for about a block), then put the car into drive, and started moving forward down another street; the officer admitted that the suspect was simply speeding away to escape, not to harm anyone, and the officer knew the suspect and would be able to find him quickly (and did so afterward).).  *See also Garner*, *supra*; *Williams*, *supra*.

speeds as high as 100 miles per hour.  *Id.*  The defendant officer parked his cruiser across two

lanes in front of the motorcycle's path, and non-party witnesses said the officer parked his car

there only two seconds before the crash occurred.  *Id.*  The motorcycle hit the cruiser shortly

thereafter, and both riders suffered severe injuries.  Relying on *Brower*, the court held that the

officer violated a clearly established right "if he pulls his squad car onto a highway with

knowledge or reason to know that an approaching motorcyclist will not have time or the ability

to stop or otherwise safely avoid collision with the car."  *Id.* at 540.

The second, *Stamm v. Miller*, 657 F. App'x 492 (6th Cir. 2016), also is factually similar.

That case, like this one, involved a motorcyclist who had been speeding in excess of 100 miles

per hour on a highway while being pursued by an officer from one jurisdiction.  657 F. App'x at

493.  He passed several cars during the chase.  *Id.*  The defendant officer entered onto the

highway, activated his lights, and repeatedly applied his brakes while in front of the motorcycle.

*Id.* at 494.  At one point his vehicle shifted back to the right, and the motorcycle crashed into the

back left side of the car.  *Id.*  The district court denied the officer's summary judgment motion,

concluding that there were disputes of fact and that his actions, viewed in the plaintiff's favor,

violated clearly established constitutional rights.  *Id.* at 496.  In affirming, the Sixth Circuit

emphasized that the motorcyclist did not pose a great danger to others at the time of the collision.

Rather, he "was being pursued at 4:20 a.m. along a highway six and then four lanes wide, with a

large median dividing him from oncoming traffic and no pedestrians or businesses in sight."  *Id.*

at 495.  Additionally, "at the time and place of the collision . . . , there are no vehicles to be seen

in the immediate vicinity."  *Id.*  Based on these facts, the appellate court stated that a reasonable

juror could conclude deadly force was used when the decedent "posed no immediate threat to

others."  *Id.* at 496.

The *Buckner* court did not address whether there were other motorists in the area or risks to others from the motorcycle and its occupants, but certainly the holding of *Buckner* supports Acord's position.  Likewise, there are some distinctions between *Stamm* and this case, and there were other vehicles in the vicinity here as well as the upcoming lane closure and changed traffic pattern.  So, there was certainly more of a threat than in *Stamm*.  But on the whole, both of these out-of-circuit decisions generally support Acord's arguments that there was a Fourth Amendment violation.

Other circuits, however, have reached opposite conclusions in similar circumstances, showing that there is not a consensus of out-of-circuit law in Acord's favor.  For example, in *Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019), the court held that a deputy who set up a rolling roadblock (slowing down and moving in front of a motorcyclist, and causing a collision with the motorcyclist), was entitled to qualified immunity where the motorcyclist had initially been speeding and then twice eluded police by traveling over 100 miles per hour.  917 F.3d at 873–74, 876–87.  In so holding, it rejected the plaintiff's reliance on *Brower* for the same reason the court believes it does not control here—any discussion of the reasonableness of the seizure was dicta, not the holding.  *Id.* at 877–78.  *Morrow* also noted there was no out-of-circuit consensus as to whether such force was reasonable, pointing, in particular, to the Fourth Circuit's decision in *Abney v. Coe*, discussed *infra*, as conflicting with the Sixth Circuit cases relied upon by Acord.  *Id.* at 879.

Additionally, Stilley points to *Willis v. Mock*, 600 F. App'x 679 (11th Cir. 2015), where a fleeing motorcyclist was tased as he was trying to "shoot the gap between" two police vehicles lined up as a roadblock.  600 F. App'x at 683.  The motorcyclist crashed and sustained significant injuries.  *Id.*  Relying on *Scott* and *Plumhoff*, the Eleventh Circuit held that, even if

tasing him was deadly force, there was no violation of the motorcyclist's Fourth Amendment rights.[10]  *Id.* at 684–85.

Ultimately, the question is whether it was clearly established that, under *Graham*, Stilley's conduct would violate Michael's Fourth Amendment right.  And the court does not believe it was.  None of the cases above—neither the Fourth Circuit and Supreme Court cases nor a "consensus" of cases from other courts of appeals—would inform Stilley that his conduct was clearly unconstitutional.  The *Morrow* court's reasoning is also sound here:

> Under [plaintiffs'] view, [the officer] should be forced to decide—with life-or-death consequences for innocent motorists, in less than seven seconds, and upon pain of personal liability—whether his chase is more like *Abney* and *Mullenix*, or more like a slow-moving motorcycle pursuit "across an empty field in the middle of the night in rural Kentucky," *Walker*, 649 F.3d at 503. Section 1983 does not put [the officer] to that choice.  Nor do we.

917 F.3d at 880.

Furthermore, in analyzing the *Graham* factors, this case falls in a "gray area," the precise type of situation that warrants qualified immunity.  *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.").

---

[10]  The Eleventh Circuit reached the opposite conclusion in an earlier, published decision, *Walker v. Davis*, 649 F.3d 502 (11th Cir. 2011).  There, the decedent motorcyclist led police on a low-speed chase (60 miles per hour on "empty stretches of highway") and ran one red light.  He also had swerved around another police car blocking the road, going into the lane for oncoming traffic as he did so.  He then drove into a muddy, "empty" field where the police officer followed.  649 F.3d at 503.  The police officer rammed the back of the motorcycle, knocking the driver off and crushing him underneath the cruiser.  The court held that a reasonable jury could determine that the officer employed unreasonable force.  It emphasized that, at the moment the police officer used force, the individual was no longer on the roadway and there were no other vehicles in the vicinity.  Thus, he "posed no immediate threat to anyone."  *Id.* at 503.  Contrasting the case before it from *Scott*, in which Harris had engaged in a "Hollywood-style car case of the most frightening sort" and placed police and bystanders at great risk of serious injury, *id.* (quoting *Scott*, 550 U.S. at 380), the *Walker* Court said the chase before it "was a sleeper," *id.*  As discussed in the text, the court concludes that the chase here falls somewhere in the middle of those two extremes in terms of the level of dangerousness.

As for the first factor—the severity of the crime, the parties dispute what "crime" is at issue. For the reasons discussed above, however, the court concludes that the undisputed facts establish that Michael clearly had committed reckless driving and that Stilley knew that fact at the time he used force. Additionally, Michael had engaged in at least a misdemeanor charge of eluding police, under § 46.2-817(A)–(B).[11]

Crediting Acord's explanation, then, the first factor weighs slightly in Acord's favor. In particular, Michael's crimes (construed in Acord's favor) are misdemeanors—reckless driving and misdemeanor eluding. The court notes though, that regardless of the legal offense Michael was committing, the dashcam video establishes that Stilley knew that Michael was driving at speeds in excess of 100 miles per hour in a 40 mile-per-hour zone as he came into Narrows and that Michael was not stopping, despite a police officer pursuing him with his lights and siren activated.

As to the second factor—the extent to which "the suspect poses an immediate threat to the safety of the officers or others"—the facts here are not as clearly in the defendant's favor as some other cases. As Acord notes in his response brief, there is no evidence that Michael was "weaving" in or out of traffic in a dangerous fashion (although Vinson's dashcam video shows him passing other vehicles), and there is no evidence that he had crossed into oncoming traffic, at least immediately prior to his alleged loss of control or wobbling shortly before impact. Further, although there was steady traffic, it was not very congested. In most other cases where the

---

[11] Stilley further contends that if Michael had collided with Pitzer's vehicle, he would have been guilty of a more serious felony, potentially felony homicide or involuntary manslaughter. And Stilley cites to cases, including a published Fourth Circuit case, that evaluated the "seriousness" of the crime by whatever crime the officer believed the suspect was about to commit, even if the officer was mistaken. (Mem. Supp. of Mot. Summ. J. 14–16 (citing *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), among others).) But again, this relies on the version of events in which Stilley knew of Pitzer's presence and acted to protect him, and in which Michael would have collided with Pitzer absent Stilley's actions. That version of events is not construing the facts in Acord's favor, as the court must.

defendant either got qualified immunity or was determined not to have violated a fleeing

motorist's rights, the motorist engaged in *more* dangerous behavior.  For example, the driver was

weaving or driving the wrong way on certain streets, or he was eluding for a longer period of

time or distance, both of which arguably would pose a greater danger to the public or police

officers than simply speeding (albeit at very high speeds) on a motorcycle.

On the other hand, the fact that Michael was speeding at night, and that he was on a

motorcycle, which only had one headlight, makes his conduct slightly more dangerous than any

case which occurred during the day.  *But cf. Abney*, 493 F.3d at 418 (noting that the motorist in

*Scott* was driving "in the dead of the night," and stating that the fact that Abney was driving

during the day meant "only that Abney had the opportunity to scare more motorists to death").

Moreover, there were other motorists in close proximity, including some he passed and others

stopped in the right-hand lane at the intersection where Stilley was, and there also was the

minivan indicating an intent to turn left in front of the path of the case.  Also, there was a

narrowed and unusual traffic pattern a half-mile ahead.  A motorcycle traveling at 100 miles per

hour or more in that situation certainly poses a danger to other motorists in the immediate

vicinity and likely to people down the road, as well.  *See Pasco ex rel. Pasco v. Knoblauch*, 566

F.3d 572, 581 (5th Cir. 2009) (explaining that assessment of the threat requires the court to

consider not only the safety of persons present at the moment of collision but also "the safety of

those who could have been harmed if the chase continued") (citing *Scott*, 550 U.S. at 380 & n.7).

Overall, then, it is fair to say that Michael posed a serious danger to others, even if he was not

headed directly into oncoming traffic at Stilley's location.

The third *Graham* factor—"whether [the suspect] is actively resisting arrest or attempting

to evade arrest by flight"—is clearly in Stilley's favor.  Relatedly, Stilley correctly points out

that the *Scott* Court noted, in explaining why the officer did not violate the motorist's rights, that the fleeing motorist was the person who intentionally placed himself and the public in danger, and those who might have been harmed by him had the officer not acted "were entirely innocent." 550 U.S. at 373. The same analysis applies here and cuts against Acord.

In summary, then, the first *Graham* factor slightly favors Acord, the second slightly favors Stilley, and the third strongly favors Stilley. Overall, the court believes it is a close factual question as to whether Stilley in fact violated Michael's rights. So again, an analysis of the *Graham* factors does not lead to the conclusion that Stilley's conduct violated a *clearly established* right.

For all the foregoing reasons, the court concludes that Stilley is entitled to qualified immunity as to Acord's § 1983 claim. Thus, summary judgment in Stilley's favor is proper as to that claim.

## C. State-Law Claim for Battery

With regard to the battery claim, Stilley correctly notes that it rises or falls with the Fourth Amendment claim, as numerous courts have recognized. And generally, those courts treat the state-law claims the same as § 1983 claims, even when ruling on qualified immunity grounds. *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) ("The parallel state law claim of assault and battery is subsumed within the federal excessive force claim . . . ."); *see also Hicks v. City of Lynchburg*, 696 F. Supp. 3d 211, 230–31 (W.D. Va. 2023) (granting summary judgment to defendants on § 1983 excessive force claim on qualified immunity grounds and noting that plaintiff's assault and battery and gross negligence claims thus also fail) (citations omitted).

Stilley has asserted that he is entitled to state law good faith immunity with regard to

Acord's battery claim.  (Mem. Supp. Mot. Summ. J. 25.)  The Fourth Circuit has noted the "limited guidance on the scope of" Virginia's "good faith" defense available to police officers, *Wingate v. Fulford*, 987 F.3d 299, 312 (4th Cir. 2021), which entitles a police officer "to immunity if he acts 'in good faith and with [a] reasonable belief in the validity' of his conduct."  *Amisi v. Brooks*, 93 F.4th 659, 674 (4th Cir. 2024) (citing *DeChene v. Smallwood*, 311 S.E.2d 749, 751 (1984); *Wingate*, 987 F.3d at 312.   Furthermore, the Fourth Circuit has "recognized that Virginia's immunity doctrine 'is congruent with the federal qualified immunity defense.'"  *Id.* (quoting *Wingate*, 987 F.3d at 312).  In light of that binding statement, the court concludes that Stilley is entitled to Virginia's "good faith" defense with regard to the battery claim for the same reasons that the court concludes Stilley is entitled to qualified immunity.

## IV.  CONCLUSION

For the reasons discussed above, the court will grant summary judgment for Stilley as to all claims.  The court also will deny all pending remaining motions as moot.

An appropriate order will be entered.

Entered: September 20, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge